**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**JAMES SMITH,**

    **Plaintiff,**

    **v.**

    Civil Action No. <u>1:26-cv-2 Kleeh</u>

**HARRISON RURAL ELECTRIFICATION ASSOCIATION, INC., and TERRY STOUT,** individually and in his official capacity,

    **Defendants.**

> ELECTRONICALLY
> FILED
> 1/05/2026
> U.S. DISTRICT COURT
> Northern District of WV

## COMPLAINT

Plaintiff James Smith ("Plaintiff"), by counsel, brings this action against Defendants Harrison Rural Electrification Association, Inc. ("HREA" or "Defendant HREA") and Terry Stout ("Stout", "GM Stout" or "Defendant Stout") (collectively, "Defendants"). In support thereof, Plaintiff asserts as follows based upon information and belief, personal knowledge, and the investigation conducted up until the filing of this Complaint:

## INTRODUCTION

1.    This action arises from Defendants' unlawful actions towards Plaintiff for reporting fraud, waste, abuse of federal funds, and violations of federal and state law. Plaintiff served as HREA's Human Resources ("HR") Manager for nearly five years, and his total annual compensation package was approximately $110,000, up until the time of his wrongful termination. HREA is a federal grantee that: (i) received approximately over $20 million in federal grants from the United States Department of Agriculture ("USDA") for fiber optic infrastructure and/or installation; (ii) operates under the federal Rural Electrification Act of 1935; and (iii) is subject to government oversight.  Plaintiff discovered and reported, without limitation, the: (a) fraudulent

sale of a HREA owned bucket truck valued at $40,000-$50,000 for a mere $3,300 to a former HREA board president; (b) manipulation of leave accruals by GM Stout to secure approximately $100,000 in his personal retirement payout; (c) unauthorized and substantial raise and promotion to an unqualified HREA employee and personal associate of GM Stout; and (d) illegal interception of electronic communications by GM Stout in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511, *et seq*. ("ECPA").

2.    After reporting these activities to both HREA's Accounting Manager and Board President - and directly questioning GM Stout regarding the legality and appropriateness of his conduct - Plaintiff was terminated on March 28, 2025, with the sole stated reason being "lack of cash flow" - a demonstrably false pretext as evidenced by HREA's creation of new positions, substantial raises to other employees, and maintenance of bank balances well over one million dollars.

3.    Plaintiff brings claims under federal law, including 41 U.S.C. § 4712 (federal whistleblower protection) and 31 U.S.C. § 3730(h) (False Claims Act retaliation).  Plaintiff also brings state law claims under West Virginia's public policy exception to at-will employment, breach of implied contract, promissory estoppel/detrimental reliance, and the West Virginia Wage Payment and Collection Act.

**JURISDICTION AND VENUE**

4.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under federal law, including 41 U.S.C. § 4712 and 31 U.S.C. § 3730(h).

5.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

6.    Venue is proper pursuant to 28 U.S.C. § 1391(b), as Defendants reside and conduct business in this district, and the events giving rise to this action occurred within this district.

## PARTIES

**A.    Plaintiff**

7.    Plaintiff James Smith is an individual and West Virginia resident who was employed by HREA as Human Resources Manager from on or about June 1, 2020, through March 28, 2025. At the time of his termination, Plaintiff was 56 years old; served as State Director and local Chapter President of the West Virginia Society for Human Resource Management; and had over 25 years of human resources experience.

**B.    Defendant HREA**

8.    HREA is an electric utility cooperative corporation organized under West Virginia law, with its principal place of business in Harrison County, West Virginia. HREA is publicly owned, democratically controlled by its members, provides electric services and internet access in seven West Virginia counties, and exercises monopoly control over electric service in its territory. HREA receives millions in federal grants, and is funded by utility payments from its members/customers and government grants.

9.    HREA received over $20 million as a grant from the USDA for fiber optic infrastructure and installation, and borrowed an additional approximate $6 million to further fund this project. Upon information and belief, HREA also maintains operational loans from (without limitation) the USDA, CoBank, and Farm Leasing, totaling several million dollars. HREA is subject to oversight by the USDA, U.S. Rural Utility Services, and West Virginia Public Service Commission. HREA was congressionally created pursuant to the federal Rural Electrification Act of 1935, and operates under this statutory authority.

10.    As a congressionally-created entity receiving substantial federal funding, operating under federal statutory authority, and subject to federal oversight, HREA is a federal grantee and contractor within the meaning of 41 U.S.C. § 4712 and 31 U.S.C. § 3729 *et seq*.

**C.    Defendant Terry Stout**

11.    Defendant Terry Stout was at all relevant times HREA's General Manager and/or Chief Executive Officer. Defendant Stout acted within the course and scope of his employment and under color of official authority in committing the acts alleged herein, and also acted outside his authority and for personal benefit. Defendant Stout is sued individually for personal misconduct, and in his official capacity for acts committed on behalf of HREA.

## FACTUAL ALLEGATIONS

**A.    HREA's Policies and Plaintiff's Employment**

12.    HREA maintains written employment policies governing employee conduct, whistleblowing, retention of legal counsel for guidance and attendance at board meetings, board approvals for personnel decisions, performance evaluations, compensation, and termination. HREA's whistleblower policy requires employees to report fraud, waste, and illegal activity.

13.    Plaintiff was employed by HREA as Human Resources Manager from on or about June 1, 2020, through March 28, 2025. His total compensation with 401(k) and defined benefit retirement was approximately $110,000 per year. Plaintiff was never given formal performance evaluations despite policy requirements. Moreover, Plaintiff was never documented or characterized as an "at-will" employee. Plaintiff performed his duties professionally and competently at HREA using his 25 plus years of HR experience.

**B.    Discovery of Fraudulent Truck Sale**

14.     In or around early 2024, Plaintiff became responsible for disposing of HREA vehicles through the J. Pyle auto auction. Plaintiff discovered that in or around 2022, GM Stout sold a 2012 Dodge 5500 bucket truck worth approximately $40,000-$50,000 to former board president and current HREA board member Jeff Nelson for only $3,300—approximately 7-8% of fair market value based on comparable sales data and industry valuation methods. This sale constituted fraud, waste, and breach of fiduciary duty. Because HREA receives substantial federal funding, this fraudulent disposition also constituted misuse of federal funds.

**C.     Discovery of Leave Manipulation**

15.     Plaintiff discovered GM Stout manipulated his own personal leave accruals to position himself for an approximate $100,000 retirement payout, in violation of HREA's written policy limiting annual leave carryover. When Plaintiff questioned Stout about this, Stout stated "he was the CEO and was not subject to the policies." This manipulation constituted fraud, self-dealing, and misuse of HREA resources, including federal funds.

**D.     Discovery of Improper Compensation and Promotion**

16.     Plaintiff discovered that HREA employee Ty Chapman, who upon information and belief is GM Stout's personal acquaintance and neighbor, received a substantial raise in salary upon promotion to Operations Manager without board approval and/or performance evaluation/ documentation. Chapman was originally hired by HREA as a Right of Way tree manager. When Sam Satterfield (a 35-year lineman previously earning $140,000 in total compensation) retired as Operations Director, Stout named Chapman as Satterfield's replacement without advertising the position. Chapman's total compensation increased from approximately $80,000 to approximately $130,000 despite not having the requisite qualifications or experience for employment as a utility

lineman or operations manager. This violated HREA policies and constituted favoritism, nepotism, and misuse of federal funds.

**E.    Discovery and Witnessing of ECPA Violations**

17.    GM Stout used HREA administrative tools and/or electronic devices to monitor and access HREA members' and employees' spouses' internet activity without their consent. Plaintiff personally witnessed in real time GM Stout access websites visited by an HREA employee's spouse. Plaintiff also personally witnessed in real time GM Stout access internet activity of another HREA member/internet customer, about whom Stout complained regarding high internet usage. When Plaintiff directly questioned the legality of this specific conduct, GM Stout responded: "I provide the internet, I can see what I want."

18.    Defendant Stout's monitoring and disclosure of electronic communications was intentional, knowing, and without consent, in violation of the ECPA. Upon information and belief, Defendant Stout engaged in this illegal monitoring on multiple occasions over an extended period, affecting numerous HREA members and employees' family members. HREA (as well as other third-party entities unnamed herein) provided Defendant Stout with the tools and access to commit these violations, and failed to implement adequate policies or safeguards to prevent them.

**F.    Plaintiff's Protected Whistleblowing Activities**

19.    In or around March 2024, Plaintiff informed HREA Accounting Manager Christy Cleghorn that he believed the aforementioned truck sale constituted fraud and potential criminal conduct. In or around the latter part of 2024, Plaintiff again told Cleghorn that he believed the truck sale was unlawful. Plaintiff did not mention it directly to Stout because he feared retaliation. On or about December 15, 2024, Plaintiff went to HREA Board President Bill Suan's house on a Sunday evening to discuss the fraudulent truck sale and other unlawful activities. The Board

President indicated he was "appalled" by these facts, but stated he didn't know what to do since "there isn't an attorney on the board for him to run this by."

20.    In or around July 2024, Plaintiff informed HREA Accounting Manager Cleghorn of his well-founded and good faith belief that GM Stout's personal leave accrual manipulation was wrong and/or improper. Plaintiff also discussed this topic with Board President Suan during the December 15, 2024 meeting. Suan's response was: "This is going to be an issue when Stout goes to retire if I'm still on the board."

21.    Plaintiff also discussed the improper and substantial raise and promotion given to Ty Chapman with Board President Suan during the December 15, 2024 meeting.

22.    Indeed, during the December 15, 2024 meeting, Plaintiff informed Board President Suan of the multiple examples of misconduct Plaintiff had witnessed.

23.    Plaintiff reported this activity pursuant to HREA's whistleblower policy. Upon information and belief, the HREA board has had no attorney since 2021, contrary to HREA's written policy requiring retention of legal counsel and counsel's presence at board meetings. All of Plaintiff's reports were made in good faith based on reasonable belief that the conduct violated federal and state laws, regulations, and policies, and constituted gross mismanagement, waste, and abuse of federal funds. Plaintiff's reports concerned matters of substantial public importance, including fraud, waste of taxpayer dollars and HREA member utility payments, violations of federal privacy laws, and breach of fiduciary duties.

## G.    Retaliatory Adverse Actions

24.    Coincidentally, Accounting Manager Cleghorn received a substantial 10% pay increase in January 2025, shortly after Plaintiff's reports to her in late 2024. Upon information and belief, this was designed to reward Cleghorn's loyalty and/or silence, and/or to incentivize her to

provide information about Plaintiff's whistleblowing to GM Stout. Upon information and belief, Cleghorn informed GM Stout of Plaintiff's reports, precipitating his unilateral decision to terminate Plaintiff.

25.     Moreover, a new warehouse position was created that GM Stout had previously argued wasn't needed, and a new employee was hired approximately two weeks before Plaintiff's termination. In late February 2025, when Plaintiff reiterated the position wasn't needed, GM Stout became very upset and contradicted his previous opposition. Moreover, on information and belief, on behalf of HREA, GM Stout hired a new employee approximately three to four months after Plaintiff's termination to assist in the fiber optic project described herein. Such activity at HREA contradicts the claim that Plaintiff's position was eliminated due to cash flow concerns.

26.     Additionally, Plaintiff was denied approximately 80 hours of sick leave pay, despite HREA employee Ty Chapman receiving approximately 40 hours under similar medical circumstances. Plaintiff was also denied reimbursement for work-related mobile phone use, despite HREA Board Policy 209 stating all managers would be compensated for such use. These denials were inconsistent with HREA's treatment of similarly situated employees, and constituted adverse actions towards Plaintiff.

27.     On January 30, 2025, approximately two months before Plaintiff's termination, HREA employee Bridget McCloy came to Plaintiff's office asking if he had been demoted. She explained that she needed items from Sam's Club that Plaintiff routinely purchased, but stated, "I know you handle getting these items, but if you have been demoted, I don't want to ask you to go get these for me." This demonstrates that Accounting Manager Cleghorn and GM Stout were discussing Plaintiff's job status and potential termination as early as January 2025, shortly after Plaintiff's reporting in late 2024.

**H.    Hostile Work Environment**

28.    GM Stout frequently used profanity, ridiculed HREA employees and board members publicly, and cultivated a culture of fear and retaliation. He made derogatory statements about board members, including, without limitation, calling them "fucking idiots" and "dumbasses." He stated numerous times that "the board members never do their jobs they just want their fee and food for the meetings." He made discriminatory comments about employees, referring to former employees as "fags" based on their sexual orientation. These statements created a hostile, intimidating work environment, and discouraged employees from reporting illegal conduct.

29.    Moreover, requests by Plaintiff to improve policies, purchase safety equipment, or approve training were regularly denied. For example, Plaintiff advised GM Stout that a new roof was needed because rain ran down inside the garage onto electric junction boxes, but this safety concern was ignored. As yet another example, Plaintiff's numerous requests to purchase Automated External Defibrillators for the safety of HREA linemen employees were denied. These denials were part of a pattern of marginalization and adverse treatment to punish Plaintiff for whistleblowing.

**I.    Plaintiff's Wrongful Termination**

30.    On or about March 28, 2025, Plaintiff was abruptly terminated after nearly five years of employment at HREA, and ordered to vacate the premises with the only stated reason being "lack of cash flow." Nothing—neither warning nor severance—was provided. Plaintiff's position was eliminated without board approval, despite HREA policies requiring such approval. Moreover, internal financial records did not reflect cash flow issues, and the HREA budget is approved in November for the entire following calendar year, indicating any legitimate financial

constraint would have been known during the November 2024 budget process and months before Plaintiff's March 28, 2025 termination.

31.    The timing of Plaintiff's termination demonstrates a causal connection between his protected whistleblowing and/or reporting, and his termination. The "cash flow" reasoning was contradicted by (in part): (a) creation of a new warehouse position and an additional hiring approximately two weeks before Plaintiff's termination; (b) the 10% raise to Accounting Manager Cleghorn in January 2025; and (c) the unsupportable raise and promotion provided to Ty Chapman. Accordingly, Plaintiff's termination was motivated by Defendants' desire to silence his reports of fraud, waste, abuse of federal funds, and violations of federal privacy laws.

**J.    Additional Misconduct**

32.    Legal counsel was not engaged by HREA from 2021 through 2025, despite its policy requiring attorney engagement/retention and/or presence at board meetings. This absence also violated HREA's policies purporting to establish a channel for whistleblower complaints. Moreover, internal bank accounts were accessed using a single shared login, violating basic cybersecurity standards.

33.    Subsequent to his termination, Plaintiff's name remained on an HREA MVB Bank account with an over $1 million balance, creating potential liability for him related to financial transactions over which Plaintiff has no control. HREA maintains only two bank accounts: a primary Truist account and a "pledged security" MVB account. Federal grant funds are accounted for separately but intermingled with operating funds generated from customer payments, violating basic accounting controls and creating opportunities for misuse of federal funds.

34.    Plaintiff also discovered Defendant Stout was collecting Business and Occupation ("B&O") taxes from HREA members in Bridgeport, WV, and assessing an administrative fee in

addition to the B&O taxes. When examining customer bills, the percentage charged appeared impermissible by law. Stout collected B&O taxes from approximately 500 HREA members, remitted to the City of Bridgeport, and then retained a percentage based on a categorization of these taxes as "administrative" costs. Plaintiff reviewed the tariff form HREA was required to submit to the Public Service Commission, and did not observe the identification or mention of administrative fees. Furthermore, businesses are not permitted to show B&O taxes on invoices as pass-through taxes. When Plaintiff reported this to Accounting Manager Cleghorn, she feigned ignorance and failed to substantively respond.

### K.    Post-Termination Harassment

35.    Post-termination, Accounting Manager Cleghorn sent Plaintiff a harassing letter falsely demanding COBRA payment of $342.72, despite COBRA benefits being managed by the National Rural Electric Cooperative Association ("NRECA"), and not HREA. Plaintiff paid NRECA directly for elected coverages. This unwarranted demand demonstrated HREA's incompetence in COBRA administration and overall, in its business practices, and constituted post-termination harassment meant to intimidate Plaintiff and discourage him from pursuing his legal rights.

### L.    Damages

36.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer substantial damages, including, without limitation: back pay and front pay lost wages; lost retirement benefits; lost health insurance and benefits; loss of professional reputation; severe emotional distress, humiliation, embarrassment, anxiety, and mental anguish; damage to professional relationships and career prospects; loss of enjoyment of life; and other economic and non-economic damages to be proven at trial.

37.    Defendants' conduct was willful, wanton, malicious, and in reckless disregard of Plaintiff's rights, warranting punitive damages.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF FEDERAL WHISTLEBLOWER PROTECTION ACT
### (41 U.S.C. § 4712)

38.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

39.    HREA is a recipient of federal grants exceeding $10 million from the United States Department of Agriculture ("USDA"), including a broadband infrastructure grant awarded under the USDA ReConnect program. As a recipient of these federal funds, HREA qualifies as a "contractor, subcontractor, grantee, or subgrantee" subject to 41 U.S.C. § 4712.

40.    Plaintiff is an "employee" who engaged in protected activity by disclosing to HREA management (Accounting Manager Cleghorn) and the Board of Directors (Board President Suan)—individuals responsible for investigating and addressing misconduct—information Plaintiff reasonably believed constituted:

1. Gross mismanagement of federal grant funds, including misuse of USDA broadband grant funds;
2. Gross waste of federal funds, including the fraudulent sale of HREA property and improper compensation of employees;
3. Abuse of authority relating to federal grants; and
4. Violations of federal law, including the Electronic Communications Privacy Act, 18 U.S.C. § 2511 *et seq*.

Plaintiff's disclosures were made in good faith, and specifically concerned misuse of federal funds awarded under the USDA ReConnect broadband grant - a matter of substantial public concern.

41.    Defendants were aware of Plaintiff's protected disclosures regarding the USDA broadband grant and other federal funds, and discharged Plaintiff on March 28, 2025, in retaliation for reporting misconduct and abuse of federal funds.

42.    Plaintiff's protected disclosures concerning HREA's mismanagement, waste, and abuse of federal funds, including the USDA broadband grant, were a contributing factor in Defendants' termination decision, as demonstrated by temporal proximity, pretextual justifications, inconsistent conduct, and other evidence of retaliatory intent.

43.    Moreover, Defendants cannot demonstrate that they would have terminated Plaintiff absent his protected reports and disclosures.

44.    Plaintiff is entitled to relief including, without limitation, back pay with interest, loss of benefits, front pay, compensatory damages, and reasonable attorneys' fees and costs pursuant to 41 U.S.C. § 4712(c).

**COUNT II: VIOLATION OF FALSE CLAIMS ACT ANTI-RETALIATION PROVISION (31 U.S.C. § 3730(h))**

45.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

46.    HREA receives substantial federal funds requiring submission of certifications, reports, and claims regarding compliance with grant terms, proper use of funds, adequate internal controls, and adherence to laws. Upon information and belief, HREA submitted false claims, statements, or certifications, including false certifications of compliance, false representations regarding internal controls, and also concealed fraud and misuse of federal funds.

47.    The fraudulent activities Plaintiff reported constitute violations of and/or create liability under the False Claims Act, 31 U.S.C. § 3729 *et seq*.

48.    Plaintiff engaged in protected activity under 31 U.S.C. § 3730(h) by investigating and reporting conduct constituting False Claims Act violations. His actions constituted "lawful

acts done... in furtherance of an action under this section or other efforts to stop one or more violations of this subchapter."

49.     Defendants were aware of Plaintiff's protected activity and discharged Plaintiff in retaliation. Plaintiff's protected activity was a motivating factor in Defendants' termination decision.

50.     Plaintiff is entitled to, without limitation: two times back pay, interest on back pay, compensation for special damages sustained as the result of the discrimination and retaliation, and litigation costs and reasonable attorneys' fees pursuant to 31 U.S.C. § 3730(h).

## COUNT III: WEST VIRGINIA PUBLIC POLICY WRONGFUL DISCHARGE - REPORTING FRAUD AND WASTE

51.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

52.     West Virginia recognizes a public policy exception to at-will employment where "an employee may claim damages for wrongful discharge when the motivation for the firing contravenes public policy." *Harless v. First National Bank*, 246 S.E.2d 270, 275 (W.Va. 1978). Where the employer's motivation is to contravene substantial public policy, the employer may be liable for damages. *See, id*.

53.     The *Harless* case itself involved an employee who discovered his bank employer had intentionally and illegally overcharged customers, reported these illegal practices to a member of the Board of Directors, and was subsequently terminated.  Accordingly, Plaintiff's situation parallels *Harless*: he discovered fraud and unlawful activities, reported them to management and a Board member, and was subsequently terminated.

54.     West Virginia public policy strongly supports reporting fraud, waste, misuse of federal funds, and illegal activity, particularly involving publicly owned entities and federal funds. This policy is reflected in: federal whistleblower statutes (41 U.S.C. § 4712, 31 U.S.C. § 3730(h));

West Virginia's Public Employees Whistleblower Law, W. Va. Code § 6C-1-1 *et seq*.; criminal statutes prohibiting fraud and misappropriation; federal and state laws governing proper use of government funds; the False Claims Act; HREA's own whistleblower policy; and common law principles protecting those who report unlawful conduct.

55.    Plaintiff engaged in conduct protected by West Virginia public policy by discovering and reporting serious fraud, waste, misuse of federal funds, violations of criminal law, and gross mismanagement. His reports served substantial public interests including protecting taxpayer funds and HREA member payments, ensuring accountability of federal grantees, protecting HREA members' interests, attempted prevention of ECPA violations, and ensuring honest governance of a publicly owned utility.

56.    Defendants' motivation for terminating Plaintiff was to silence his reports, prevent further disclosure, punish him for whistleblowing, and contravene public policy principles protecting whistleblowers. The stated "cash flow" reason for this termination was pretextual.

57.    Retaliatory discharge is a tort allowing recovery of compensatory damages, including lost wages, benefits, emotional distress damages, and punitive damages where the defendant's conduct is shown to be willful, malicious, or in reckless disregard of the plaintiff's rights. <u>See</u>, *Collins v. Elkay Mining Co.,* 179 W. Va. 549, 371 S.E.2d 46, Syl. Pt. 5 (1988). Defendants' conduct was willful, malicious, and in reckless disregard of Plaintiff's rights, warranting substantial punitive damages.

### COUNT IV: WEST VIRGINIA PUBLIC POLICY WRONGFUL DISCHARGE - REPORTING VIOLATIONS OF FEDERAL AND STATE LAW

58.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

59.    West Virginia courts look to statutes, constitutional provisions, regulations, and judicial opinions to determine public policy, including criminal laws.  <u>See</u>, *Birthisel v. Tri-Cities*

*Health Services Corp.*, 424 S.E.2d 606, 610 (W.Va. 1992). ECPA violations are federal crimes punishable by fines and imprisonment under 18 U.S.C. § 2511(4).

60.     West Virginia has a strong public policy against violations of privacy rights and illegal surveillance. Plaintiff witnessed Defendant Stout's willful ECPA violations and expressed his good-faith belief directly to Stout that the surveillance was unlawful.  Plaintiff also reported these violations to HREA Board President Suan in December of 2024.

61.     Reporting violations of federal and state law serves substantial public policy interests in preventing illegal surveillance and protecting privacy rights, especially when affecting numerous members of the public. Defendants terminated Plaintiff in part for reporting ECPA violations, contravening substantial public policy. Defendants' conduct was willful and malicious, warranting substantial damages.

### COUNT V: BREACH OF IMPLIED EMPLOYMENT CONTRACT

62.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

63.     West Virginia recognizes implied employment contracts where an employee handbook or policies contain provisions related to termination for good cause and through specified procedures. See, *Cook v. Heck's Inc.*, 342 S.E.2d 453 (W.Va. 1986); and *Hogue v. Walker Machinery*, 431 S.E.2d 687 (W.Va. 1993). An employer may not be bound if the handbook contains a clear and conspicuous at-will disclaimer, or if the employee acknowledges at-will status in writing.

64.     The HREA employment policy does not contain an at-will disclaimer.  Moreover, Plaintiff was never provided documentation stating his employment was "at-will," and never signed an at-will employment acknowledgment.

65.    HREA's written policies, taken together, created an implied contract limiting HREA's right to terminate at will, including: requirements for board approval of position eliminations; mandatory annual performance evaluations; Board Policy 209 requiring compensation for managers' work-related mobile phone use; sick leave and benefits policies; whistleblower procedures; requirements for legal counsel at board meetings; and specified budgetary approval processes. These policies created reasonable expectations that Plaintiff would not be terminated except through proper procedures and for legitimate cause.

66.    HREA breached this implied contract by: eliminating Plaintiff's position without board approval despite policy requirements; failing to provide required annual performance evaluations; failing to compensate for work-related mobile phone use despite Policy 209; denying sick leave pay contrary to policy and inconsistent with treatment of similarly situated employees; terminating without following required procedures or board approval; terminating without cause, warning, or legitimate reason; and violating its own whistleblower and other internal policies by retaliating against Plaintiff.

67.    HREA's breach was willful, in bad faith, and for improper retaliatory purposes, warranting an award of substantial damages.

### COUNT VI: WEST VIRGINIA WAGE PAYMENT AND COLLECTION ACT VIOLATIONS (W. Va. Code § 21-5-1 *et seq.*)

68.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

69.    The West Virginia Wage Payment and Collection Act, W. Va. Code § 21-5-1 *et seq.*, ("the Act") requires employers to pay all wages and fringe benefits due.  W. Va. Code § 21-5-4(a) provides that "every employer shall pay all wages or fringe benefits, or both, due its employees... on regular pay days."

70.     HREA failed to compensate Plaintiff for work-related mobile phone use despite Board Policy 209 explicitly stating "all managers would be compensated" for such use. Plaintiff used his personal mobile phone for work-related purposes throughout his employment, incurring expenses and costs. HREA's failure to compensate Plaintiff violated Policy 209 and constituted a failure to pay wages or fringe benefits due under the Act.

71.     Moreover, HREA denied Plaintiff approximately 80 hours of sick leave pay to which he was entitled under HREA's sick leave policy. In contrast, HREA provided Ty Chapman with approximately 40 hours of sick leave pay in similar medical circumstances, demonstrating both that the policy entitled employees to such compensation and that HREA's denial to Plaintiff was discriminatory. This denial violated HREA's policy and constituted a failure to pay wages/fringe benefits due to Plaintiff under the Act.

72.     The denial of these wages and benefits was willful and intentional, as HREA knew of its policy obligations and deliberately refused compliance with respect to Plaintiff. Upon information and belief, these failures were motivated by discriminatory and retaliatory animus.

73.     Pursuant to W. Va. Code § 21-5-4(e), Plaintiff is entitled to: recovery of all unpaid wages and fringe benefits; liquidated damages; reasonable attorneys' fees and costs; and such other relief as may be appropriate.

## COUNT VII – PROMISSORY ESTOPPEL / DETRIMENTAL RELIANCE
### (West Virginia Law)

74.     Plaintiff re-alleges and incorporates all prior paragraphs.

75.     Defendants - through written employment policies, established procedures, compensation policies, whistleblower protections - made clear and definite promises that Plaintiff would:

  o   Be subject to termination only for legitimate, non-retaliatory reasons;

18

- o  Receive procedural protections including board approval for position elimination;
- o  Be protected from retaliation for reporting fraud, waste, abuse, and unlawful activity; and,
- o  Receive sick leave and compensation benefits as provided in HREA policies.

76.      Defendants reasonably expected and intended that Plaintiff would rely on these promises by continuing his employment, performing his duties, and reporting misconduct internally rather than to external authorities.

77.      Plaintiff reasonably and foreseeably relied on Defendants' promises by:

a.  Remaining employed with HREA for nearly five years;

b.  Declining or foregoing other employment opportunities;

c.  Reporting fraud, misuse of federal funds, and illegal surveillance through internal channels; and,

d.  Continuing to perform his duties in reliance on promised protections and procedures.

78.      Plaintiff's reliance was reasonable in light of Defendants' written policies, absence of any clear at-will disclaimer, HREA's governance structure, and Defendants' representations and conduct.

79.      Defendants breached these promises by retaliating against Plaintiff, denying promised benefits, eliminating Plaintiff's position without required board approval, and terminating Plaintiff under false pretenses.

80.      As a direct and proximate result of Defendants' breach, Plaintiff suffered substantial detriment, including loss of employment, lost wages and benefits, loss of retirement accruals, emotional distress, and damage to professional reputation.

81.      Injustice can be avoided only by enforcing Defendants' promises and awarding Plaintiff appropriate relief.

82.     Accordingly, Plaintiff seeks all relief available under West Virginia law, including reliance damages, lost wages and benefits, equitable relief, and such other relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff James Smith respectfully requests that this Honorable Court enter judgment in his favor and against Defendants, and that he be awarded, without limitation, the following relief:

**A.    Actual and Compensatory Damages**

83.     Back pay from March 28, 2025, through judgment, including all salary, bonuses, and compensation Plaintiff would have earned, with prejudgment interest.

84.     Front pay from judgment through expected retirement representing future lost earnings.

85.     Compensation for all fringe past and future benefits lost, including: make-whole contributions to 401(k) and defined benefit pension for all periods of lost employment with appropriate earnings adjustments; health insurance coverage retroactive from termination date and reimbursement for all COBRA premiums and out-of-pocket medical expenses paid; all other employee benefits to which Plaintiff would have been entitled; and compensation for any diminution in retirement benefits, including calculation of benefits as if Plaintiff had remained continuously employed.

86.     Compensatory damages for emotional distress, mental anguish, humiliation, embarrassment, anxiety, depression, loss of self-esteem, loss of reputation, loss of professional standing, and loss of enjoyment of life, in an amount to be determined at trial.

87.    Damages for lost professional opportunities, damage to career prospects, and harm to professional reputation.

88.    Liquidated damages pursuant to W. Va. Code § 21-5-4(e) for willful failure to pay wages/fringe benefits.

89.    Compensation for unpaid wages and fringe benefits, including mobile phone reimbursement and sick leave pay, with interest.

90.    Compensation for special damages, including expenses in seeking other employment, COBRA premium costs, and other out-of-pocket expenses.

91.    Prejudgment interest on all compensatory damages at the applicable legal rate.

**B.    Punitive Damages**

92.    Punitive damages against all Defendants, jointly and severally, in amount sufficient to punish their willful, wanton, malicious, oppressive, and reckless conduct, and to deter similar future conduct, in amount to be determined by a jury.

**C.    Attorneys' Fees and Costs**

93.    Reasonable attorneys' fees and costs pursuant to 41 U.S.C. § 4712(c)(3), 31 U.S.C. § 3730(h)(2), W. Va. Code § 21-5-4(e), and any other applicable law.

94.    All costs of litigation, including expert witness fees, filing fees, deposition costs, discovery expenses, witness fees, costs of exhibits and trial technology, and all other reasonable expenses.

95.    Prejudgment and post-judgment interest on all amounts awarded at applicable legal rates.

**D.    Additional Relief**

96.    All relief necessary to make Plaintiff whole and remedy violations alleged herein.

97.    Such other and further relief as this Court deems just, proper, equitable, and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b) and the Seventh Amendment to the United States Constitution.

## PRESERVATION OF EVIDENCE

Plaintiff respectfully requests that this Court order Defendants to preserve and refrain from destroying, altering, or disposing of any documents, electronic communications, computer records, financial records, personnel files, email communications, text messages, meeting minutes, audio recordings, video recordings, and any other evidence relevant to the claims in this Complaint, including but not limited to:

1. All documents relating to Plaintiff's employment, performance, compensation, benefits, and termination.
2. All documents relating to the sale of the 2012 Dodge 5500 bucket truck to the former board president.
3. All documents relating to GM Stout's leave accruals and retirement benefits.
4. All documents relating to Ty Chapman's compensation, raise, and promotion.
5. All documents relating to HREA's receipt and use of federal grants and loans.
6. All documents relating to HREA's internet service infrastructure and monitoring capabilities.
7. All computer logs, internet browsing histories, and electronic monitoring records.
8. All employment policies and procedures, including whistleblower policies.
9. All board meeting minutes, agendas, and related documents.
10. All financial records, budgets, bank statements, and cash flow analyses.
11. All communications between Defendants and Accounting Manager Christy Cleghorn.
12. All communications regarding Plaintiff among all HREA employees, management and board members.
13. All documents relating to other employee terminations, compensation decisions, and personnel actions during the relevant time period.

14. All other documents and electronically stored information relevant to this litigation.

Respectfully submitted,

***/s/ JAMES SMITH***
Plaintiff

By Counsel

Sean W. Cook, Esq. (WV Bar No. 10432)
309 Dolaron Lane
South Charleston, WV 25309
Phone: 681.313.9809

sean@seanwcooklaw.com